1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DONALD WINTERS,

                              Plaintiff,

v.

CITY OF KENT, et al.,

                              Defendants.

No. C09-476Z

ORDER

## I.   INTRODUCTION

This matter comes before the Court on motions for summary judgment by Defendant Kent Police Officers Association ("KPOA"), docket no. 18, and Defendant City of Kent ("Kent"), docket no. 38.  None of the parties requested oral argument.  As the motions are directly related, the Court has considered them together.  Having reviewed the pleadings submitted by the parties and the supporting declarations, the Court enters the following combined order.

## II.   FACTUAL BACKGROUND

### A.   The Parties and Present Lawsuit

Plaintiff Donald Winters ("Winters") was born in 1952 and is currently fifty-seven years old.  Winters Decl. ¶ 1, docket no. 51.  Winters was employed by the City of Kent Police Department from October 1, 1975, to July 1, 2008.  Id.  From the period of June 1, 1987, to July 1, 2008, Winters was employed as a Detective.  Id.  During that time, the

1   quality of Winters' performance evaluations varied but he was assigned more cases than any

2   other detective in the unit and he was assigned more difficult and complex cases than his

3   peers.  Winters Decl. ¶¶ 28, 41-42, Exs. 19, 24, docket no. 51; <u>see also</u> Alexander Decl. Exs.

4   B-H, docket no. 40.

5        Kent is a municipal corporation organized under the laws of the State of Washington.

6        KPOA is a nonprofit labor organization collectively representing commissioned police

7   officers employed by Kent.  Cobb Decl. ¶ 1, docket no. 21.  KPOA is not, and has never

8   been, Winters' employer.  <u>Id.</u> ¶ 6; Luxenberg Decl. Ex. G, docket no. 20.

9        On April 8, 2009, Winters filed this employment age discrimination action against

10   Kent and the KPOA.  Compl., docket no. 1.  Winters alleges age discrimination in violation

11   of the Federal Age Discrimination in Employment Act ("ADEA") and the Washington Law

12   Against Discrimination ("WLAD") (<u>Id.</u> ¶ 3.1), "violat[ion] of the public policy of

13   Washington State" (<u>Id.</u> ¶ 3.2), "constructive discharge" (<u>Id.</u> ¶ 3.3), and "intentional or

14   negligent infliction of emotional distress" (<u>Id.</u> ¶ 3.4).

15   **B.**    **Rotation Policy Under Chief Crawford**

16        On January 10, 2003, the Chief of Police for the City of Kent, Ed Crawford, issued a

17   Memorandum stating that career incumbent detectives, such as Winters, would not be

18   impacted by the Police Department's decision to adopt a five-year rotation for officers newly

19   recruited into the position of Detective.  Winters Decl. ¶ 5, Ex. 1, docket no. 28.  The

20   "Crawford Memorandum" provided, in pertinent part:

21       . . . [T]he following is the Chief's decision with regard to the Detective
    Assignment.

22

23       •   Effective immediately, all new incumbents assigned to the Detectives
      unit shall be subject to a rotation every five (5) years.  This rotation
      schedule shall only impact new and/or future vacancies in the Detectives

24         unit.  It shall not impact employees currently assigned to the Detectives
      unit.

25

26       •   At the time of such rotation, the incumbent detective shall be eligible to
      reapply for his/her assignment.  Such reapplication shall be considered
      in the same manner as other applicants competing for the assignment.

- Incumbents of this Detective assignment shall be expected to respond to call-outs as identified in the KPOA collective bargaining agreement and applicable memoranda of understanding with the City.

It is the Chief's hope that the above rotation will enable the Department to provide a change of pace and career development opportunities for its employees.

Although the rotation policy under Chief Crawford ultimately did not impact officers currently assigned to the Detectives unit, such as Winters, Winters had actively opposed rotation as being discriminatory on the basis of age during the discussions leading up to the policy. Winters Decl. ¶ 5, docket no. 28.

C.    **Rotation Policy Under Chief Strachan**

In the summer of 2006, Steve Strachan became the Kent Chief of Police. Strachan Decl. ¶ 2, docket no. 39. In a Memorandum issued August 21, 2007, Chief Strachan announced a new rotation policy which required the rotation of positions not only through the Detectives unit, but also through other "specialty positions," such as bike officers and narcotics. Id. Ex. 1, (the "Strachan Memorandum"). Chief Strachan's stated purpose of his rotation policy, set forth in the Strachan Memorandum, was for "the growth and development of personnel." Id.; see also id. ¶ 4. Chief Strachan subsequently testified that the policy was developed to promote an exchange of personnel and thereby eliminate the "us versus them" mentality that existed between the Detectives unit and Patrol. Id. ¶ 5. The policy was also intended as a means of changing the "toxic work environment" that existed in the Detectives unit in 2006.[1] Id. ¶ 6; Alexander Supp. Decl. Ex. 2, docket no. 54.

_____

[1] Winters alleges that Chief Strachan improperly relied upon representations by management members who had previously made ageist comments, or otherwise exhibited bias toward older employees when he determined that a "toxic work environment" existed in the Detectives unit. Winters Decl. ¶ 34, docket no. 51. Winters does not provide any evidence identifying the management members that he contends are biased, or how they had any connection with Chief Strachan's decision. Paul Luke, a detective over the age of 40 that Winters alleges was directly affected by Chief Strachan's rotation policy, agreed with Strachan's assessment about the Detectives unit, stating that he believed a few officers made the unit a toxic environment. Wooster Decl. Ex. 4 at 20:7-25, 21:1-11, docket no. 50. Luke identified the negative environment in the Detectives unit as the primary reason for his decision to voluntarily transfer back to Patrol. Id. at 27:13-25, 28:1-15.

ORDER   -3-

The Strachan Memorandum explained how positions would be rotated under the new policy as follows:

> . . . Mandated rotation occurs only if we do not achieve a desired rate of two openings per year through attrition.
>
> . . . If there are not two openings through attrition, then the two most senior detectives would be identified to rotate by the Division Commander and be notified that they would bid for a patrol shift for the next available rotation. . . .
>
> The Division Commander's decision on which personnel to rotate can be based on tenure, but may also include other factors, such as significant pending investigations, special training or function, or other factors. . . .

Strachan Decl. Ex. 1, docket no. 39.  Unlike the rotation policy under Chief Crawford, Chief Strachan's rotation policy did not exempt currently-assigned Detectives from rotation. Chief Strachan concluded his Memorandum with the following statements about his consultations with KPOA and his authority to enact the policy:

> I have notified and discussed this issue with the KPOA Executive Board, and after welcoming their opinion and input, assert the fact that the movement of personnel and assignment are within the purview of the administration. . . .

Id.

**D.   Communications Between the Parties Prior to Chief Strachan's Announcement of his Rotation Policy**

In May 2007, Winters and Chief Strachan exchanged emails regarding Winters' concerns.  Winters Decl. ¶ 13, Ex. 10, docket no. 51.  Chief Strachan attempted to explain his reasons behind the then-proposed policy, and Winters provided the following response on May 9, 2007:

> . . . I fully understand the philosophy behind your intent, and know that your action is taken with the interest of the Department.
>
> . . . I have but a short time frame of service left in me.  I have a retirement window of 1 to 3 years out.  As the most senior person in Investigations I am the obvious choice for the first person, selected for rotation.
>
> I wish to finish my career in my current assignment. . . .
>
> I am in the hopes that I and some others close to retirement will be given the opportunity to leave the Department on our own terms.  I made a career choice years ago that I wanted to work in Detectives. . . .

<u>Id.</u>  Soon thereafter, in a written request dated May 14, 2007, Winters asked KPOA to take action with respect to Chief Strachan's then-proposed rotation policy:

. . . [T]he duty of the union body is to represent its members, not management.

Let me state on the one set [sic] here that the Chief's actions in this case, do not carry the darkness displayed by the prior Police administration.  We can all argue the merits good and bad, regarding allowing Investigations to being a career path or not.  The question now becomes how do we get there?

. . . While the new Chief may claim, the old rules do not apply; I and others may disagree with that stand.  The past practice and intent of the parties are of relevance in this type of dispute.  It was communicated to us, verbally by a union board member and in writing by Chief Crawford that the rotation did not apply to current members of the Detective unit.

. . . I am asking the Union to request that the Chief allow the natural process for replacement of personnel in my work group. . . .

I also feel the need to address . . . the over all view, attitude, that some in both the union and management have expressed or displayed toward 'older' members of this Union and Department.

We have all heard the terms used toward older members of my work group in the past by fellow union members.  We have been called 'Dead Wood.'  It has been stated to an older employee, 'Why would we sent you to training, as you are too old to invest in.'  I was personally asked by a supervisor of this Department 'Wouldn't you give up your job to allow a younger more aggressive Officer the chance? . . .

. . . With in a short time frame, my job will open for that 'younger aggressive officer.'  I am in hopes that the opening will come on my chosen time table, and that I am not forced the decision to fight or flight. . . .

I am requesting that the Union Body protect my rights and the rights of other members affected by this pending action.  I am requesting that the union ask the Chief, to let older tenured members remain in their current assignments.

Winters Decl. ¶ 17, Ex. 7, docket no. 28.  On May 24, 2007, KPOA's President Cobb informed Winters that his issue "is not in need of an immediate solution;" that "[t]he proposed detective rotation (as well as other units) will be addressed;" but that KPOA was first awaiting a meeting with its attorney and was addressing "more pressing items."  <u>Id.</u> ¶ 18, Ex. 8.  On May 25, 2007, Cobb sent an email to the email list entitled, "Police Detectives," acknowledging that detective rotation "has huge implications for some of you," and requesting "patience and understanding" while the union "figure[d] out if [it] had a dog in

1   this fight."  Winters Decl. ¶ 19, Ex. 9, docket no. 28.  On May 31, 2007, Captain Ronald

2   Price sent an email to "Police Detectives," notifying them that he was placing the rotation

3   policy on hold in light of KPOA's voicing of concern from its membership "about the

4   rotation concept for detectives (and potentially other assignments)."  Id. Ex. 10.  Captain

5   Price further explained in his email that KPOA had requested "some time to discuss this

6   further with [its] membership and address the issue through negotiations if appropriate."  Id.

7   **E.      KPOA's Decision Not to Raise Rotation Issue as Part of Contract**
    **Negotiations and Not to Contest Chief Strachan's Rotation Policy**

8

9        KPOA did not raise the rotation policy issue as a mandatory subject of contract

10  negotiations because it determined that the issue fell within the "management rights" clause

11  of the Collective Bargaining Agreement ("CBA") between the City of Kent and KPOA.

12  Cobb Decl. ¶ 10, Ex. B, docket no. 21 (CBA in existence during relevant period) at Section

13  12.1.C (providing that "management retains the exclusive right to . . . assign . . . employees

14  in positions in the City."); see also id., Ex. C (prior CBA with similar language) at Section

15  12.1.C; Wales Decl. ¶ 2, docket no. 19; Suppl. Wooster Decl., Ex. 1 at 28:18-21 (KPOA did

16  not put forward any proposal in the collective bargaining process regarding the issue of

17  detective rotation), and 29:6-11 (KPOA determined detective rotations was a management

18  right), docket no. 35.

19       KPOA considered raising the rotation issue as a subject of permissive bargaining in

20  the negotiations for a new CBA.  Wales Decl. ¶ 2, docket no. 19.  To this end, in June 2007,

21  KPOA conducted an anonymous written survey of its members.  Cobb Decl. ¶ 11, Ex. D,

22  docket no. 21 (email to membership and sample survey).  The survey identified 19 separate

23  issues that "were suggested by the membership for the upcoming Sergeants/Officers

24  Contract, 2008-2010," one of which was whether a "rotation of personnel in specialty units"

25  should be established.  Id.  As a result of the survey, KPOA concluded that "[t]he majority

26  indicated their support for establishing a rotation of personnel into and out of specialty units

    such as the Detectives Unit."  Wales Decl. ¶ 2, docket no. 19.  Accordingly, KPOA decided

ORDER   -6-

not to raise the rotation issue as a subject of permissive bargaining.  Luxenberg Decl., Ex. E, docket no. 20.  On August 30, 2007, after Chief Strachan announced his rotation policy, KPOA's Executive Board Member, Brendan Wales, sent an email to KPOA membership stating KPOA's position that "there are no substantial grounds to contest the Chief's management decision in regards to establishing a rotation of assignments."  Wales Decl. ¶ 3, Ex. A, docket no. 19.

**F.      Alleged Impact of Chief Strachan's Rotation Policy on Senior Detectives**

On August 21, 2007, when Chief Strachan issued his memorandum outlining his rotation policy, Winters was fifty-five years old and was the most senior detective in the Detectives unit.  Winters Decl. ¶ 8, docket no. 51.  Robert Kaufman and Geary Murray were the second and third most senior detectives in the Detectives unit, respectively, and they were, like Winters, "significantly older than age forty" at the time Chief Strachan announced his policy.  Winters Decl. ¶ 8, Ex. 5, docket no. 51 (tenure roster). Winters asserts that "[e]veryone [in the Detectives unit] impacted by the decision to renounce the past practice expressed in... the January 10, 2003 [Crawford] memorandum, was over age forty."  Id. ¶ 9.

Winters has identified two officers that he believes were forced out as a result of the rotation policy:  Sergeant Jon Quackenbush and Detective Paul Luke.  Winters Decl. ¶ 33, docket no. 51; Pl.'s Resp. at 15, docket no. 49.  However, Quackenbush was scheduled to return to Patrol in January 2007, before Strachan announced the policy change.  Alexander Supp. Decl. Ex. 5, p. 39-40, docket no. 54.  Moreover, although he was being rotated out, he "took it as a positive" and was "interested to go back [to patrol]."  Wooster Decl. Ex. 3, 39:8-11, 41:24-25; 42:1-7, docket no. 50.  Ultimately, Quackenbush retired before he was rotated back to patrol, but he did so voluntarily due to his concerns about his age and health.  Id. at 28:1-20, docket no. 50.  Similarly, Paul Luke testified that the primary reason he left the Detectives unit was because he didn't enjoy working with the people in the unit.  Wooster Decl. Ex. 4, 27:13-25, 28:1-15, docket no. 50.  Rather than wait for a mandatory rotation, he decided to voluntarily transfer to patrol.  Id. at 46:22-25, 47:1-24.  In fact, a mandatory

1   rotation would probably not occur for several years because there were six detectives more

2   senior than him in the unit.  Winters Decl. ¶ 8, Ex. 5, Ex. 51, docket no. 51.

3          Winters is not aware of any person who was involuntarily rotated out of the

4   Detectives unit pursuant to the 2007 rotation policy.  Wooster Decl. Ex. 5, 80:23-25, 81:1-7,

5   105:6-14, docket no. 51 ("Q:  And are you aware whether anybody has been rotated out since

6   you left?  A:  No, I'm not.").  In fact, as of April 22, 2010, no officer had been involuntarily

7   rotated out of the Detectives unit as a result of the 2007 policy.  Strachan Decl. ¶ 9, docket

8   no. 39.

9   **G.**       **Winters' View of Detectives Unit and Patrol Unit Assignments**

10          As a Detective, Winters enjoyed a 3.5% pay increase over the pay received by officers

11   assigned to patrol duties, and his hours of work were closer to traditional employment of

12   Monday through Friday during standard business hours, with the exception of occasional call

13   out duty or overtime. Winters Decl. ¶ 3, docket no. 51.  Rotation from the position of

14   Detective would have meant returning to the position of a patrol officer, which Winters

15   regarded as "a significant demotion."  Id. ¶¶ 3, 11.  Winters asserts that a rotation into the

16   position of patrol officer would have involved a substantial change in his pay, hours of work,

17   and working conditions.  Id. ¶ 30.  "At age fifty-five the prospect of returning to a patrol car

18   and chasing suspects, wrestling with drunks, and the other day to day activities of patrol duty

19   was a career ending prospect for me."  Id. ¶ 11.

20   **H.**       **Application of Chief Strachan's Rotation Policy to Winters**

21          It is undisputed that Winters was never rotated out of the Detectives unit.  Luxenberg

22   Decl. Ex. G, docket no. 20; Alexander Supp. Decl. Ex. 1 at 2, docket no. 54.  Because he was

23   not given a date for rotation, id., there is a factual dispute as to when or whether Winters

24   would have been subject to rotation had he not retired in July 2008.  Winters believed that he

25   "was scheduled to be rotated out" of his Detective unit position in August 2008 because there

26   was insufficient natural attrition in the Detectives unit before he retired (two officers per

1  year, according to the Strachan Memorandum) to preclude the mandatory rotation.  Winters

2  Decl. ¶ 33, docket no. 51.

3  **I.      Winters' Retirement / Alleged Constructive Discharge**

4         In December 2007, Winters informed the City of Kent that he would retire in January

5  2008.  Winters Decl. ¶ 10, Ex. 9 (resignation letter), docket no. 51.  However, in light of a

6  cancer diagnosis in January 2008, "it was necessary [for] me to postpone my retirement to

7  July 1, 2008 in order to maintain medical coverage." Id. ¶ 22.

8         On May 30, 2008, Winters provided Chief Strachan with his "notice of intent to

9  retire," effective July 1, 2008.  Alexander Decl. Ex. A [Ex. 14 to Winters Dep.], docket

10  no. 40.

11  **J.      Detective Unit Assignments Under Chief Strachan's Rotation Policy**

12         Officer Steve Holt, who was over forty years old, was assigned to the position of

13  detective on February 19, 2008.  Alexander Decl. Ex. I, docket no. 40.  Officer Angie

14  Ellsworth, who was in her late twenties or early thirties, replaced Winters in the Detectives

15  unit after his retirement.  Winters Decl. ¶ 26, docket no. 51.  Winters asserts that Ellsworth

16  did not meet the minimum qualifications for the position because she did not have three years

17  on the force.  Id.

18  **K.      Dispute Surrounding Sick Leave Cash Out**

19         In November 2007, the City and KPOA had discussed giving Winters an eighty

20  percent sick leave cash out upon his retirement based on his almost having reached the thirty

21  years of "commissioned officer" service required for such a benefit.  Winters Decl. ¶ 23, Ex.

22  17, docket no. 51 (email from City of Kent's Labor Relations Manager Anh Hoang, to

23  KPOA's Cobb, dated June 16, 2008).  The agreement was never completed or signed as a

24  result of Winter's decision not to retire in January 2008.  Id., Ex. 17.  On June 16, 2008, the

25  City notified KPOA that it was again willing to enter into such an agreement in light of

26  Winters' notice of his decision to retire on June 30, 2008.  Id.

1  When presented with a resignation agreement that contained a release of claims

2  against the City of Kent and KPOA as a precondition for a sick leave buy out, Winters

3  refused to sign. <u>Id.</u> ¶ 24, Ex. 18. (proposed resignation agreement and release of claims).[2]

4  Winters was "shocked" that KPOA's Cobb had signed the agreement in light of the release

5  language contained therein because, he asserts, "[a] release of age discrimination claims was

6  never discussed with the City as a condition precedent to receipt of my 80% payout." <u>Id.</u>

7  ¶ 33, Ex. 17 (letter from Winters to KPOA's Cobb, dated June 28, 2008).

8  **L.  <u>Ageist Remarks</u>**

9  During a December 2002 meeting between KPOA and City officials, at which time

10  the "issue of rotation of incumbents from the Detective ranks" was discussed, Winters asserts

11  that KPOA officials made "ageist and disrespectful remarks about senior detectives in the

12  position." Winters Decl. ¶¶ 5-6, Ex. 2, docket no. 51 (notes from that meeting by unknown

13  author).[3]  For example, KPOA official Wayne Himple allegedly stated: "Must have a way to

14  move out dead wood, can't be stagnant." <u>Id.</u> ¶ 8. Winters also states that it was common for

15  individuals in the department to refer to older officers as "dead wood,"[4] and that the

16  environment in the Detectives unit was generally negative towards older officers. Winters

17  Decl. ¶ 14, docket no. 51; Wooster Decl. Ex. 5 at 37-39, docket no. 50.

18

19

20  [2] The Court DENIES KPOA's motion to strike the proposed resignation agreement and
release of claims. Reply at 8-9, docket no. 32. <u>See</u> Cassino v. Reichhold Chemicals, Inc., 817 F.2d

21  1338, 1342-43 (9th Cir. 1987) (holding that a termination made contemporaneously with a severance
package that includes a release of discrimination claims is probative of discriminatory intent).

22

23  [3] Winters was not present at this meeting.

24  [4] Winters' testimony about the meaning of the phrase "deadwood" is inconsistent with the
testimony of other officers. Geary Murray, a close friend of Winters and fellow detective in Kent
stated that the phrase "deadwood" came from him, and that it refers to someone who is not doing

25  their job. Alexander Supp. Decl. Ex. 3 at 26:6-12, 37:8-11, docket no. 54. Similarly, Detective Paul
Luke testified that the term was used by individuals in the department to refer to people who are

26  "nonproducing, taking up space, [or] unproductive." Wooster Decl. Ex. 4 at 44:12-24, docket no.
50. However, the meaning of the phrase is a factual dispute that may not be decided by the Court on
summary judgment.

1   Winters asserts that he had opposed KPOA on various ageist remarks and was

2   regarded negatively for making his concerns known.  Winters Decl. ¶ 8, docket no. 28.  He

3   asserts that when Chief Crawford adopted the policy that permitted him and other senior

4   detectives to keep their spots in the Detectives unit, he received hostility from KPOA

5   officials.  Id. ¶ 9.  He asserts that he was subjected to baseless internal investigations.  Id.

6   However, Winters admits that "during the last three years of [his] employment no KPOA

7   executive board member ever made an ageist comment to [him]."  Luxenberg Decl. Ex. G,

8   docket no. 20.  KPOA's President, Jeffrey Cobb, asserts that he has "never made an ageist

9   remark to Winters," and he is unaware of any other KPOA Executive Board member making

10  an ageist remark to Winters.  Cobb Decl. ¶ 14, docket no. 21.

11  Winters also testified about another comment made by his then-supervisor, Sergeant

12  Mark Gustafson, suggesting that older officers such as Winters should give up their jobs to

13  allow younger, more aggressive officers the chance.  Winters Decl. ¶ 14, docket no. 51; see

14  also id. ¶ 39, Ex. 23 (memo complaining about Sergeant Gustafson's ageist remarks, dated

15  September 8, 1998); Wooster Decl. Ex. 5 at 40:20-25, 41:1, docket no. 50.  In his deposition,

16  Winters conceded that this comment was made in 1998.  Wooster Decl. Ex. 5 at 185:3-23,

17  docket no. 50.  Gustafson was Winters' supervisor until 2002.  Strachan Decl. ¶ 10, docket

18  no. 39.  Although Winters cannot point to any other specific instances of ageist comments

19  directed at him,[5] he asserts that the "general flavor" of the Detectives unit was negative

20  towards older employees during his tenure.  See e.g., Wooster Decl. Ex. 5 at 34:7-14, docket

21  no. 50.

22

23

24  _____

25  [5]Winters cites to one other ageist comment made to another older employee, Sergeant
    Quackenbush.  See e.g., Wooster Decl. Ex. 3 at 45:2-14, docket no. 50 (Sergeant Quackenbush

26  testifying that he was not approved for new training by his supervisor Lieutenant Holt because of his
    age).  The comment made to Sergeant Quackenbush took place in 2001-2002, more than five years
    before the 2007 rotation policy was implemented.  Id.  The comment was not made by senior
    management officials with the City, was not directed at Winters, and was not made in his presence.

ORDER  -11-

1 **M.     Winters' EEOC Claim**

2       On August 8, 2008, Winters filed a claim against KPOA with the EEOC, alleging age

3 discrimination against KPOA.  Cobb Decl. ¶ 15, Ex. I, docket no.21.  On January 7, 2009,

4 the EEOC formally dismissed Winters' claim.  Id.

5                          **III.     ANALYSIS**

6 **A.     Summary Judgment Standard**

7       Summary judgment shall be granted if no genuine issue of material fact exists and the

8 moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving

9 party bears the initial burden of demonstrating the absence of a genuine issue of material

10 fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When a properly supported motion

11 for summary judgment has been presented, the adverse party "may not rest upon the mere

12 allegations or denials" of its pleadings.  Fed. R. Civ. P. 56(e).  The non-moving party must

13 set forth "specific facts" demonstrating the existence of a genuine issue for trial.  Id.;

14 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Marquis v. City of

15 Spokane, 130 Wn.2d 97, 105 (1996) (requiring "a plaintiff alleging discrimination in the

16 workplace" to "establish specific and material facts to support each element of his or her

17 prima facie case" in order to overcome summary judgment).

18 **B.     Winters' ADEA Claims**

19       **1.     ADEA Claim Against Kent**

20       "A plaintiff alleging discrimination under the ADEA may proceed under two theories

21 of liability: disparate treatment or disparate impact."  Rose v. Wells Fargo Co., 902 F.2d

22 1417, 1421 (9th Cir. 1990).  Proof of disparate treatment requires a showing that the

23 employer treats some people less favorably than others because of their age.  Id.  Disparate

24 impact requires no showing of discriminatory intent, but the plaintiff must actually prove that

25 the challenged policy has a discriminatory impact.  Id.  Here, Winters alleges that both the

26 disparate treatment and disparate impact theories apply.

1                  a)        <u>Disparate Impact Claim</u>

2         A disparate impact claim challenges a facially neutral employment practice that has a

3 significant adverse effect on a protected group and cannot be justified by business necessity.

4 <u>Rose v. Wells Fargo & Co.</u>, 902 F.2d 1417, 1424 (9th Cir. 1990); <u>see also</u> <u>Griggs v. Duke</u>

5 <u>Power Co.</u>, 401 U.S. 424, 431 (1971) ("The Act proscribes not only overt discrimination but

6 also practices that are fair in form, but discriminatory in operation. The touchstone is

7 business necessity."). To establish a prima facie case of disparate impact, a plaintiff must (i)

8 identify the specific employment practice or selection criterion being challenged; (ii) show

9 disparate impact; and (iii) prove causation. <u>Rose</u>, 902 F.2d at 1424; <u>see also</u> <u>Durante v.</u>

10 <u>Qualcomm, Inc.</u>, 144 Fed. Appx. 603, 605 (9th Cir. 2005). As to the final element, the

11 plaintiff must provide "statistical evidence of a kind and degree sufficient to show" that the

12 challenged practice has caused a disparate impact due to membership in a protected group.

13 <u>Rose</u>, 902 F.2d at 1424 (quoting <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 994

14 (1988)). The statistical disparities proffered by a plaintiff "must be sufficiently substantial

15 that they raise such an inference of causation." <u>Watson</u>, 487 U.S. at 995.

16         If the plaintiff presents a prima facie case, the burden shifts to the employer to

17 demonstrate that "the challenged practice is job related for the position in question and

18 consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); <u>see</u> <u>Durante</u>, 144 Fed.

19 Appx. at 605; <u>Rose</u>, 902 F.2d at 1424. If the employer makes the requisite showing, the

20 burden shifts back to the plaintiff to prove that "other tests or selection devices, without a

21 similarly undesirable [discriminatory] effect, would serve the employer's legitimate interest"

22 and "would be equally as effective as the challenged practice" taking into account "[f]actors

23 such as the cost or other burdens of [the] proposed alternative selection devices." <u>Watson</u>,

24 487 U.S. at 998; <u>see also</u> <u>Rose</u>, 902 F.2d at 1424.

25         Here, Winters cannot establish the necessary elements of a prima facie case of

26 disparate impact age discrimination. There is no dispute that the 2007 rotation policy has

never been applied to anyone. Wooster Decl. Ex. 5 at 80:23-25, 81:1-7, 105:3-14, docket no.

ORDER  -13-

50; Strachan Decl. ¶ 9, docket no. 39.  Winters conceded in his deposition that he is not

aware of any person who was involuntarily rotated out of the Detectives unit pursuant to the

2007 policy.[6]  Id.  The only evidence before the Court is that no one has ever been subjected

to the rotation policy.  Strachan Decl. ¶ 9, docket no. 39.  Consequently, Winters cannot

show the "statistical evidence" necessary to prove causation; i.e. that the challenged practice

has caused a disparate impact due to membership in a protected group.  Rose, 902 F.2d at

1424.  Winters is purely speculating that the policy will have a disparate impact.  As such,

Kent's motion for summary judgment on Winters' disparate impact ADEA claim is

GRANTED.[7]

b)   Disparate Treatment Claim

As with claims under Title VII, in order to make a showing of disparate treatment in

violation of the ADEA, the plaintiff must first establish a prima facie case of discrimination.

See Rose, 902 F.2d at 1420 ("The shifting burden of proof applied to a Title VII

discrimination claim also applies to claims arising under the ADEA.").  "Generally, to

establish a prima facie case of an ADEA violation, the plaintiff must show he was: (1) a

---

[6] Winters argues that some officers retired rather than face the possibility of rotation.
However, both of the officers cited by Winters retired for reasons other than the 2007 rotation
policy.  Although Sergeant Quackenbush was scheduled for rotation, it was not pursuant to the 2007
policy.  Alexander Supp. Decl. Ex. 5, 39:8-25, 40:1-8 (Sergeant Quackenbush testifying that he was
scheduled for rotation before the department implemented the new rotation policy in August 2007),
docket no. 54.  Ultimately, Quackenbush retired before he was rotated back to patrol, but he did so
voluntarily due to his concerns about his age and health.  Wooster Decl. Ex. 3, 28:11-20, docket no.
50.  Officer Luke voluntarily transferred to Patrol because he did not enjoy working with the
individuals in the Detectives unit.  Id. at Ex. 4, 27:13-25, 28:1-15.  Luke was not subjected to the
mandatory rotation, and likely would not have been because there were six detectives more senior
than him in the Detectives unit.  Winters Decl. ¶ 8, Ex. 5, docket no. 51.

[7] Winters' claim for disparate impact is also barred for lack of standing.  The undisputed
evidence demonstrates that had Winters remained with the police department, he would still be a
member of the Detectives unit.  Strachan Decl. ¶ 9, docket no. 39.  Since Winters retired before the
City applied the 2007 rotation policy to him, he lacks standing to bring a claim for disparate impact.
See Farrell v. Butler Univ., 421 F.3d 609, 617 (7th Cir. 2005) (holding that a plaintiff must show
that she was personally injured by the defendant's alleged discriminatory practice to have standing
to bring a disparate impact claim); see also Henderson v. Nordstrom, Inc., 2006 WL 1148178
(W.D.Wash. 2006) (Martinez, J.) (dismissing ADEA claim sua sponte for lack of standing where
plaintiff presented no evidence that she was subjected to the allegedly discriminatory policy).

ORDER   -14-

member of a protected class [age 40-70]; (2) performing his job in a satisfactory manner;

(3) discharged; and (4) replaced by a substantially younger employee with equal or inferior

qualifications." Wallis v. J.R. Simplot Co., 26 F.3d 885, 891 (9th Cir. 1994). Plaintiff must

either provide direct evidence of discriminatory intent or establish a presumption of such

intent. Id. at 889. Once plaintiff has established a prima facie case, the burden shifts to the

defendant to articulate nondiscriminatory reasons for the allegedly discriminatory conduct.

Id. If the defendant articulates a facially nondiscriminatory reason for the conduct, the

burden shifts back to plaintiff to show that the employer's articulated reason was a pretext for

discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

There is no dispute that Winters satisfies the first and fourth elements of a prima facie

age discrimination claim. At age 57, Winters is a member of a protected class, and upon his

retirement, he was replaced by Angie Ellsworth, a substantially younger employee who he

claims had equal or inferior qualifications. Winters Decl. ¶¶ 1, 26, docket no. 51. Moreover,

although the parties dispute whether Winters was performing his job in a satisfactory

manner, compare id. ¶¶ 28, 41-42, Exs. 19, 24 with Alexander Decl. Exs. B-H, docket no. 40,

the Court must construe the facts in the light most favorable to Winters. Winters' evidence

of satisfactory recent evaluations is sufficient to establish element two of a prima facie

discrimination claim for purposes of summary judgment.

However, Winters has offered no evidence to support element three: discharge. There

is no dispute that Winters was never subjected to the rotation policy. Alexander Supp. Decl.

Ex. 1 at 2, docket no. 54. It was purely speculation on his part that the policy would have

applied to rotate him out of the Detectives unit if he had not retired. Indeed, the undisputed

evidence demonstrates that there was sufficient natural attrition[8] in the Detectives unit so that

---

[8] Winters argues that there was insufficient natural attrition and that the only reason there
were sufficient openings in the Detectives' unit to prevent operation of the rotation policy was
because of his retirement. Wooster Decl. ¶ 9, docket no. 50. ("[O]nly one position came open [in
2007] and two openings in 2008 prior to the August 2008 date that the plaintiff was slated for
rotation."). However, the testimony of Winters' attorney does not create an issue of fact for trial.
Fed. R. Civ. P. 56(e)(1) (affidavits opposing summary judgment must be made on personal

ORDER  -15-

1   Winters would not have been rotated out of the Detectives unit if he had not retired.

2   Strachan Decl. ¶ 10, docket no. 39.

3         Instead, Winters argues that his retirement was actually a constructive discharge,

4   which satisfies the third element of his prima facie case.  To establish a constructive

5   discharge, the plaintiff must show that "a reasonable person in the plaintiff's position would

6   have felt that he was forced to quit because of intolerable and discriminatory working

7   conditions."  Huskey v. City of San Jose, 204 F.3d 893, 900 (9th Cir. 2000).  Whether

8   working conditions were so intolerable and discriminatory as to justify a reasonable

9   employee's decision to resign is normally a factual question for the jury.  Id.  However,

10  courts have found that working conditions are not intolerable as a matter of law where there

11  are some combination of the following facts: the plaintiff was not demoted, did not receive a

12  cut in pay, was not encouraged to resign or was not disciplined.  See id. at 901-02; Schnidrig,

13  80 F.3d 1406, 1412 (9th Cir. 1996); King v. AC & R Adver., 65 F.3d 764, 767-68 (9th Cir.

14  1995).  Here, Kent did not demote Winters, reduce his pay, encourage him to resign,[9] or

15  discipline him.  Again, Winters simply assumed that these things would happen if he

16  remained, and his assumption turned out to be incorrect.  See Strachan Decl. ¶ 10, docket no.

17  39.  Winters cannot establish that he was constructively discharged, and therefore cannot

18

_____

19  knowledge).  Winters also cites to Kent's discovery responses to support this contention.  Id. at Ex.

20  2.  Winters' citation to Kent's discovery responses does not create an issue of fact for trial.  The
    discovery responses only identify the number of applicants to the Detectives unit who were assigned

21  to the unit from August 2007-July 2008, not the number of openings that became available.  The
    latter number is what triggers the mandatory rotation, not the former.  See Strachan Decl. Ex. 1,

22  docket no. 39 ("If there are not two openings through attrition, then the two most senior detectives
    would be identified to rotate...") (emphasis added).  The only evidence before the Court is that there

23  were sufficient openings in the unit to preclude application of the rotation policy to Winters in 2008.
    See id. ¶ 10.

24        [9] Although Winters alleges that he was encouraged to resign by his former supervisor
    Sergeant Gustafson, he testified that the comment was made in 1998, nearly 10 years before Chief

25  Strachan implemented the rotation policy.  Wooster Decl. Ex. 5, 185:3-23, docket no. 50.  The
    lengthy time period between the comment and the action by the department, coupled with the fact

26  that there is no evidence connecting Chief Strachan with Sergeant Gustafson (who has not been
    Winters' supervisor since 2002) makes it impossible for the Court to draw any inference of
    discriminatory intent.

    ORDER   -16-

1   meet the necessary elements of his prima facie case for discrimination under the ADEA.[10]

2   The Court GRANTS Kent's motion for summary judgment as to Winters ADEA disparate

3   treatment claim.[11]

4   **2.    ADEA Claim against KPOA**

5   KPOA moves for summary judgment on Winters' ADEA claim, arguing that 29

6   U.S.C. § 623(a)(1), covering "Employer Practices," does not apply to KPOA because KPOA

7   was not Winters' employer.  Because Winters admits that the "KPOA was never [his]

8   employer," see Luxenberg Decl., Ex. G, docket no. 20, (Answer to Request for Admissions

9   8).  KPOA's motion for summary judgment of Winters' ADEA claim, to the extent Winters

10  has alleged a claim under section 623(a)(1), is GRANTED.

11  Winters also asserts an ADEA claim against KPOA under 29 U.S.C. § 623(c), which

12  sets forth unlawful practices for "Labor Organizations."  Winters relies primarily on Pejic v.

13  Hughes Helicopters, Inc., 840 F.2d 667, 670-71 (9th Cir. 1988), for the proposition that a

14  union member has a right "to pursue claims against his Union for complicity in an

15  employer's discriminatory acts and its failure to protect the member from such discrimination

16  by the employer."  Pl.'s Resp. at 10, docket no. 26.  In Pejic, the Ninth Circuit affirmed the

17  summary judgment dismissal of an age discrimination claim against a union based on the

18  plaintiff's failure to establish a prima facie case of age discrimination against the employer.

19

20   [10] In light of the Court's decision that Winters has failed to establish a prima facie case of
21   discrimination, the Court need not decide whether Kent has legitimate nondiscriminatory reasons for
     the allegedly discriminatory conduct, or whether Winters has evidence demonstrating that the City's
22   reasons are merely a pretext for discrimination.  In his briefing, Winters devoted a substantial
     amount of his discussion to the issue of pretext, arguing that there is evidence of (1) ageist remarks
23   by management members; (2) efforts by the City to falsely "build a record" against him as
     alternative grounds to support a termination; (3) changing stories by management about the purpose
24   of the 2007 rotation policy; and (4) a release agreement prepared by the City for Winters' potential
     ADEA claims.  However, even if this evidence raised a question of fact as to pretext, it would not
25   relieve Winters of his burden to present evidence that he was discharged as a result of the allegedly
     discriminatory rotation policy.

26   [11]As the Court holds that Winters has failed to establish a prima facie case of discrimination
     on his ADEA claim, the Court need not address the causation issues raised by Hazen Paper Co. v.
     Biggins, 507 U.S. 604 (1993) and Gross v. FBL Fin. Servs., Inc., 127 S.Ct. 2343 (2009).

840 F.2d at 675.  Similarly here, Winters has failed to establish a prima facie case of age discrimination against the City of Kent because he was never discharged.  <u>Pejic</u> offers no relief to Winters.[12]

Winters also appears to argue that KPOA is liable under the ADEA because it refused to take the position that the rotation policy should be a mandatory subject of bargaining in the then-upcoming contract negotiations with the City of Kent.  However, the rotation policy falls within the "management rights" clause of the CBA.  Cobb Decl. ¶ 10, Ex. B (CBA) at Section 12.1.C (providing that "management retains the exclusive right to . . . assign . . . employees in positions in the City").  As such, KPOA has waived its bargaining rights through the terms of the CBA.  This is consistent with the authority cited by Winters.  Wooster Decl., Ex. 4, docket no. 27 (Washington State Public Employment Relations Commission (<u>Yakima County</u>, Decisions 6594-B & 6595-B (PECB 1999) (finding that the union waived its bargaining rights through the terms of the CBA that granted the employer the "management right" to "establish lawful work rules and procedures," "schedule work," and "to assign employees to work locations and shifts.")).  Having waived its rights, KPOA was powerless to force the City of Kent to negotiate the terms of the rotation policy as a mandatory subject of bargaining.  Therefore, KPOA's motion for summary judgment on Winters' ADEA claim is GRANTED.

---

[12]In addition to <u>Pejic</u>, Winters relies on numerous Title VII cases to support his ADEA claim against KPOA.  <u>See</u> <u>Bonilla v. Oakland Scavenger Co.</u>, 697 F.2d 1297, 1304 (9th Cir. 1982); <u>Jackson v. Seaboard Coast Line R. Co.</u>, 678 F.2d 992, 1016-18 (11th Cir. 1982); <u>Terrell v. United States Pipe & Foundry Co.</u>, 644 F.2d 1112, 1120-21 (5th Cir. 1981); <u>Kaplan v. Int'l Alliance of Theatrical and Stage Employees and Motion Picture Operators</u>, 525 F.2d 1354, 1360 (9th Cir. 1975); <u>Macklin v. Spector Freight Sys., Inc.</u>, 478 F.2d 979, 989 (D.C. Cir. 1973); <u>Burwell v. Eastern Air Lines, Inc.</u>, 458 F. Supp. 474, 503 (D.C. Va. 1978).  These Title VII cases involve a union's failure to eliminate a discriminatory provision in a collective bargaining agreement.  Here, Chief Strachan's rotation policy did not require KPOA's signature or approval, and therefore is not the equivalent of a collective bargaining agreement.

1   **C.   Winters' WLAD Claims**

2       **1.   WLAD Claim against Kent**

3       The WLAD applies the same burden shifting analysis for discrimination claims

4   applied in federal cases.  Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 180 (2001) overruled

5   on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214 (2001).  Although the parties

6   both briefly mention that different discrimination standards may apply under the WLAD as

7   compared to the ADEA (primarily on the issue of causation), Kent and Winters both apply

8   the ADEA standards to the WLAD claim.  There is no dispute that a valid WLAD claim must

9   also make a prima facie showing of an adverse action by the employer.  See Kirby v. City of

10  Tacoma, 124 Wn. App. 454, 465 (2004).  Winters has failed to make a prima facie showing

11  that he was discharged.  Accordingly, as with the ADEA claim, the Court GRANTS Kent's

12  motion for summary judgment and Winters' WLAD claim.

13      **2.   WLAD Claim against KPOA**

14      The WLAD provides that "[i]t is an unfair practice for any labor union or labor

15  organization: (1) To deny membership and full membership rights and privileges to any

16  person because of age . . . " and "(3) To discriminate against any member . . . to whom a duty

17  of representation is owed because of age . . . ."  RCW 49.60.190.[13]  Again, although the

18  parties both briefly mention that different discrimination standards may apply under the

19  WLAD as compared to the ADEA, KPOA and Winters both rely on the arguments they made

20  in connection with the ADEA claim for their arguments on the WLAD claim.  Therefore, for

21  the same reasons set forth above, the Court GRANTS KPOA's motion for summary

22  judgment on Winters' WLAD claim.

23  **D.   Wrongful Discharge in Violation of Public Policy/Constructive Discharge**

24      There is no separate cause of action in Washington for "constructive discharge."

25  Snyder v. Med. Servs. Corp., 145 Wn.2d 233, 238 (2001).  Instead, the law recognizes an

26  
_____

[13] Although not set forth in the complaint, this is the statutory section relied upon by Winters in his briefing.  Pls.' Resp. at 16, docket no. 26.

ORDER  -19-

1    action for wrongful discharge which may be express or constructive.  Id.  A discharge may

2    be wrongful for a number of reasons, such as a violation of contract, a violation of a statute,

3    or a violation of public policy.  Riccobono v. Pierce Co., 92 Wn. App. 254, 263 (1998).

4    Accordingly, Winters' common law claim is best described as a wrongful constructive

5    discharge in violation of public policy.[14]  To recover on this claim, Winters must satisfy the

6    elements of a wrongful discharge in violation of public policy claim, and the elements of

7    constructive discharge.

8          There are four elements a court must analyze in a wrongful discharge in violation of

9    public policy claim: (1) the existence of a clear public policy (clarity element); (2)

10   discouraging the conduct in which Plaintiff engaged would jeopardize the public policy

11   (jeopardy element); (3) the public-policy-linked conduct caused the dismissal (causation

12   element); and (4) there must not be an overriding justification for the dismissal (absence of

13   justification element).  Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 941 (1996).  The

14   tort is generally recognized in four situations: where an employee is fired (1) for refusing to

15   commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal

16   right; and (4) for retaliation for reporting employer misconduct.  Korslund v. Dyncorp Tri-

17   Cities Services, Inc., 121 Wn. App. 295, 319 (2004).

18         In addition, a "[c]onstructive discharge occurs where an employer forces an employee

19   to quit by making that employee's work conditions intolerable."  Martini v. Boeing Co., 137

20   Wn.2d 357, 366 n.3 (1999).  Although Washington courts "presume a resignation is

21   voluntary and, thus, cannot give rise to a claim for constructive discharge... [a]n employee

22   may rebut this presumption by showing the resignation was prompted by duress or an

23   employer's oppressive actions."  Townsend v. Walla Walla Sch. Dist., 147 Wn. App. 620,

24   627-28 (2008).  "[D]uress is not measured by an employee's subjective evaluation of a

25

26

_____

   [14] Winters has also claimed wrongful constructive discharges in violation of the ADEA and
the WLAD, which are discussed above.

ORDER   -20-

situation, and an undesirable work situation does not, in itself, obviate the voluntariness of a resignation." Id. at 628.

### 1.    Winters' Wrongful Discharge Claim against Kent

Winters argues that the public policy at issue is his right to legal representation and freedom from employer retaliation.  Specifically, Winters argues that Kent retaliated against him after he retained an attorney in 2003 in connection with his dispute with Chief Crawford. Pl.'s Resp. at 24, docket no. 49, citing Wooster Decl. Ex. 5, 33:13-25, 34:1-9, docket no. 50. Winters does not discuss any of the other factors for discharge in violation of public policy or constructive discharge, or how his retention of an attorney in 2003 has any relationship to Chief Strachan's policy change in 2007.

However, there is no dispute that Winters was not discharged; he voluntarily retired. Consequently, the City cannot be liable for wrongful discharge.[15]  Moreover, as the Court has already held, Winters cannot satisfy the elements of a constructive discharge because he has presented no competent evidence that a reasonable person would have felt compelled to resign.[16]  The Court GRANTS Kent's motion for summary judgment on Winters' common law claim for wrongful discharge in violation of public policy.

### 2.    Winters' Wrongful Discharge Claim against KPOA

Winters concedes that his claim for "termination in violation of public policy" is alleged only against the City of Kent.  Pl.'s Resp. at 23, docket no. 26.  The Court therefore GRANTS KPOA's motion for summary judgment on that claim.

---

[15] In addition, the WLAD already provides a cause of action for retaliatory discharge.  RCW 49.60.210.  The Washington Supreme Court has recognized that a plaintiff has no remedy at common law where there is an existing statutory remedy.  Sedlack v. Hillis, 145 Wn.2d 379, 390-91 (2001).  Consequently, to the extent Winters is making a claim for retaliation, he is limited to his remedy under the WLAD.  Winters' complaint contains no allegations of retaliation under the ADEA or WLAD.  Compl., docket no. 1.

[16] Winters also has presented no evidence of "duress" or "oppressive actions" by Kent that overcome the presumption that his retirement was voluntary.  See Townsend, 147 Wn. App. at 627-28.

ORDER   -21-

1

### 3.      Winters' Constructive Discharge Claims against the defendants

2       To the extent Winters has pled claims for "constructive discharge" against KPOA and

3   Kent that are independent of his claims for wrongful discharge, the Court also GRANTS the

4   defendants' motions on those claims.  <u>See</u> <u>Snyder</u>, 145 Wn.2d at 238.

5   **E.      Emotional Distress Claims**

6       ### 1.      Intentional Infliction of Emotional Distress

7       "The elements of the tort of outrage are: (1) extreme and outrageous conduct; (2)

8   intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of

9   severe emotional distress."  <u>Kirby v. City of Tacoma</u>, 124 Wn. App. 454, 473 (2004).  "The

10  conduct must be so outrageous in character, and so extreme in degree, as to go beyond all

11  possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

12  civilized community."  <u>Id.</u>  "Whether conduct is sufficiently outrageous is ordinarily a jury

13  question.  Nonetheless, the trial court must initially determine if reasonable minds could

14  differ on whether the conduct was extreme enough to result in liability."  <u>Id.</u>

15       Winters has failed to provide evidence of any of the three elements of outrage against

16  either defendant.[17]  The Court GRANTS both defendants' motions for summary judgment

17  and dismisses Winters' outrage claims against Kent and KPOA.

18       ### 2.      Negligent Infliction of Emotional Distress

19       Winters concedes that his negligent infliction of emotional distress claims are

20  appropriately dismissed in light of <u>Haubry v. Snow</u>, 106 Wn. App. 666, 678 (2001), which

21  held that a negligent infliction of emotional distress claim is subsumed by a claim of

22  discrimination where the negligence claim is premised on the same facts.  Pl.'s Resp. at 23,

23  docket no. 26; Resp. at 24, docket no. 49.  The Court GRANTS both defendants' unopposed

24

25

---

26       [17] Moreover, with respect to Kent's motion for summary judgment, Winters has presented no
opposition.  The Court considers this as an admission that the motion has merit.  <u>See</u> Local CR
7(d)(2).

ORDER   -22-

motions for summary judgment and dismisses Winters' negligent infliction of emotional distress claims.

### IV.   CONCLUSION

Defendants' Motions for Summary Judgment, docket nos. 18 and 38, are GRANTED. Plaintiff's claims against Kent and the KPOA are dismissed with prejudice.

DATED this 22nd day of June, 2010.


Thomas S. Zilly
United States District Judge

ORDER   -23-